UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK

In re

THE ROMAN CATHOLIC DIOCESE OF
ALBANY, NEW YORK,

Debtor.

Case No. 23-10244
Chapter 11

### DECLARATION OF LOIDA A. SARABIA, CHIEF FINANCIAL OFFICER OF THE ROMAN CATHOLIC DIOCESE OF ALBANY, NEW YORK REGARDING (i) DEBTOR OPERATIONS; (ii) DEBTOR ASSETS AND LIABILITIES; AND (iii) IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY MOTIONS

**LOIDA A. SARABIA,** makes the within Declaration regarding (i) Debtor operations; (ii) Debtor assets and liabilities; and (iii) in support of the Debtor's Chapter 11 Petition and First Day Motions filed in the above-captioned action pursuant to 28 U.S.C. §1746, and in support thereof states as follows:

1.      I am the Chief Financial Officer of The Roman Catholic Diocese of Albany, New York (the "Debtor")[1], having held that position since January 31, 2022.  Prior to my appointment to my current position, I served as the Chief Financial Officer of the Children's Home of Poughkeepsie, where I worked extensively on budgeting, forecasting, strategic planning and financial preparation.

2.      The Debtor is a not-for-profit corporation organized under the laws of the State of New York and pursuant to a Special Act of the Legislature of the State of New York on April 12, 1941 (Chapter 283 Laws of 1941) and is a not-for-profit corporation under Internal Revenue Code §501(c)(3).  The Debtor is both a secular organization holding the legal interest and rights of the Debtor as well as a juridic person under The Code of Canon Law of the Roman Catholic Church

---

[1] Capitalized terms used herein but not defined shall have the meanings as defined in the Longobucco Declaration or the respective motion described herein.

("Canon Law").

3.      On March 15, 2023 (the "Filing Date"), the Debtor filed a voluntary petition (the "Petition") of reorganization pursuant to Chapter 11 of the United States Bankruptcy Code (11 U.S.C. §101, et. seq.) (the "Code").

4.      As the CFO of the Debtor, I am authorized to submit the within Declaration on the Debtor's behalf regarding: (i) Debtor operations; (ii) Debtor assets and liabilities; and (iii) in support of the Debtor's Chapter 11 Petition and the motions and applications filed contemporaneously with the Petition (the "First Day Motions") seeking certain interim and final relief to avoid disruption in the Debtor's day-to-day operations and ensure continuity as the Debtor transitions to a debtor and debtor in possession under Chapter 11 of the United States Bankruptcy Code (the "Code").

5.      The within Declaration is made based upon my personal knowledge of the matters noted herein, as well as my review of documents and information provided to me by others employed by or associated with the Debtor, my own review of documents and information relevant to the Debtor's organization and operations and my experience in various capacities within the Debtor. If I was called to testify, such testimony would be consistent with the facts set forth herein.

6.      In consultation with counsel for the Debtor, I have reviewed the First Day Motions and respectfully submit that the relief requested is necessary to preserve the ongoing operations of the Debtor by ensuring that the Debtor's employees continue to receive compensation and benefits, that priests, religious parishioners and those receiving services through the Debtor continue to do so and to preserve the value of the Debtor's assets for the benefit of creditors. I further respectfully submit that the relief requested in the First Day Motions are necessary for a successful reorganization to ensure the necessary services provided by the Debtor continue without

2

interruption.  I also support the declaration of Father Robert Longobucco (the "Longobucco Declaration"), Vicar General and Moderator of the Curia of the diocese submitted in support of the First Day Motions.

## DIOCESAN OPERATIONS

7.      The Debtor was established by Pope Pius IX in 1847. The Debtor is a not-for-profit corporation formed under the laws of the State of New York and organized by a Special Act of the New York State Legislature under Chapter 283 of the Laws of 1941 and is a not for profit corporation under Internal Revenue Code §501(c)(3).  It is one of eight dioceses or archdioceses organized and operating in the State of New York. The geographical scope of the diocese covers 14 counties with approximately 306,600 Catholics residing within the diocese's geographic region who are served through 126 parishes and 4 apostolates.  The geographical region of the diocese covers the upstate New York counties of Albany, Columbia, Delaware, Fulton, Greene, Montgomery, Otsego, Rensselaer, Saratoga, Schenectady, Schoharie, Warren and Washington as well as a portion of southern Herkimer.

8.      The Most Reverend Edward B. Scharfenberger was ordained as the tenth Bishop of the diocese on February 11, 2014.

9.      The Debtor maintains a number of offices through which it carries out its spiritual and administrative functions.  In addition to the office of the Bishop and its administrative and general operations, the Debtor provides some administrative support for the parishes, schools and other similar entities (the "Non-Debtor Entities") that operate within the geographical region covered by the Debtor in order to support their spiritual, educational, social and charitable missions.

NH2023-2106082335-777307

a. **Support for Non-Debtor Entities.**         The Debtor provides support for Non-Debtor Entities, both administratively and financially, which assist in fulfilling the Debtor's spiritual, educational, ministerial and canonical missions through the offices of those entities as well as funding for the services provided through funds raised by the Diocesan Appeal and income derived from investments.

b. **Parishes.** Each of the 126 parishes within the diocese operates through separate not for profit corporations formed under the Religious Corporations Law of the State of New York. Each parish holds title to its real property and improvements separate and apart from the Debtor. Under applicable provisions of Canon Law, the president of each parish is the Bishop of the Debtor, the Vicar General of the Debtor is the vice-president and the parish pastor is the Secretary/Treasurer, and two lay persons serve as trustees.

c. **Schools.**   The Debtor supports Catholic schools operating within the diocese through the Catholic School Office and the Superintendent of Schools.

d. **Diocesan Insurance Programs.** The Debtor maintains or administers various insurance programs for the benefit of the Debtor and the Non-Debtor Entities including property and general liability policies as well as health, life and workers' compensation programs for its clerical and lay staff. The Debtor is self-insured with respect to certain types of claims up to certain dollar amounts, with excess coverage purchased from third-party insurance providers. The Debtor's various insurance programs are as set forth below regarding the Debtor's Motion for Interim and Final Orders (a) Authorizing Continued Maintenance of Debtor Insurance Program and Health Plan and (b) Authorizing

NH2023-2106082335-777307

Payment of Pre-Petition Obligations for Such Plans.

### DEBTOR ASSETS AND LIABILITIES

10.     The Debtor's assets consist of cash and equivalents, investments (including those

with and without donor restrictions), accounts receivable, notes receivable, pre-paid expenses, real

property and equipment.  The Debtor also holds an interest in an investment pool organized by the

Foundation of the Roman Catholic Debtor of Albany, New York, Inc. (the "Foundation") for the

purpose of offering the Debtor and Non-Debtor Entities (as defined herein) the opportunity to

invest collectively to maximize investment opportunities and returns consistent with their duty of

stewardship following the mandates of Canon Law and the New York Estates, Powers and Trusts

Law, the New York Uniform Prudent Management of Institutional Funds Act and the Internal

Revenue Code.  The Debtor also has funds invested with the Diocesan Investment and Loan Trust

(the "DILT").  The investments are managed by professional investment management firms and

are overseen by the Trust's Advisory Board of Directors.  Income is allocated to investors on a

unitized basis.

11.     With respect to its investments, the Debtor holds certain investments subject to

donor restrictions concerning the uses to which the funds may be put, and investments not subject

to restrictions but which are either designated for a particular purpose or benefit or are

undesignated and which the Debtor may use for unspecified purposes.  Donor-restricted funds are

subject to applicable State or federal law including, but not limited to, the New York Estates,

Powers and Trusts Law, the New York Uniform Prudent Management of Institutional Funds Act

and the Internal Revenue Code.

12.     The Debtor's fiscal year runs from July 1st to June 30th.  Based on the most recent

financial reports available as of December 31, 2022, the Debtor has total assets of approximately

$37,736,642[2], comprised of cash and equivalents, investments, accounts receivable, the Debtor's net deposits to the DILT, its investment in the Foundation, prepaid expenses, notes receivable and property and equipment (net of depreciation). Liabilities total $10,298,453, comprised of accounts payable and accrued expenses, deferred revenue (including the Debtor's Leadership grant, funding for the National Catholic Youth Conference and custodial funds collected and held by the Debtor on behalf of third-parties, such as funds received relative to special collections administered for the United States Conference of Catholic Bishops ["USCCB"]), which must be remitted to those third-parties for their specific purposes. Total net assets as of December 31, 2022 are approximately $27,438,188 comprised of undesignated funds totaling approximately $1,806,663, designated funds[3] of approximately $16,260,835 and donor-restricted funds[4] in the amount of approximately $9,370,690 and liabilities of approximately $10,298,453, excluding the unliquidated claims asserted under the CVA. Net assets not subject to donor restrictions total approximately $18,067,498, which includes the Debtor's self-insured retention for its general liability, property and worker's compensation insurance.

13.    The Debtor derives the income to support its operations and spiritual, educational and support services from parishes within the diocese and contributions to the Diocesan Appeal, payment of insurance premiums paid by Non-Debtor Entities which participate in the diocesan insurance programs (which are pass-throughs for payment of the aggregate premiums for such

---

[2] Payments of settlements to CVA Claimants and professional fees as well as market fluctuations have reduced this amount.

[3] "Designated" funds consist of monies donated to the Debtor to which the donor specified a purpose for the use of those funds. "Undesignated" funds are those donated funds to which the donor did not specify the purpose to which the funds were to be applied.

[4] "Donor-restricted funds" are those donated to the Debtor for which the donor imposed one or more restrictions specifying the use to which the donation could be applied. Such funds generally include reverter provisions applicable under the Estates, Powers and Trusts Law or other applicable statutes providing that the funds must be returned to the donor or transferred to another entity designated by the donor which can fulfill the purpose of the donation if the Debtor is no longer able to do so.

6

policies), legacies and bequests (including those with restrictions or limitations of the use of the bequests), interest and dividends earned on investments, and net gains on investments.  Depending on the nature of the restrictions imposed on contributions, the Debtor may receive the net value of previously restricted assets when the restrictions (which may be temporal or dedicated to be applied for a specific purpose) expire.   The Diocesan Appeal (the "Appeal") is an annual appeal for donations from parishioners of the parishes within the geographic region of the diocese, through the oversight and management of the Office of Stewardship and Development.  The Office of Stewardship and Development also administers and helps coordinate the majority of fundraising initiatives within the geographic region of the diocese, including increased offertory programs and capital campaigns for parishes.

14.    In general, the Appeal is revenue neutral as a result of virtually all of the donations collected being applied to fund the programs and organizations the Appeal is designed to support.

15.    Functionally, the Diocesan Appeal is based on funding goals set for each parish within the diocese.  Based upon an assessment formula, the Debtor assesses each parish as the parish's contribution toward support of the Appeal.  In the event that a parish raises funds in excess of its particular assessment, 50% of those funds are rebated to the parish.

## EVENTS LEADING TO CHAPTER 11 FILING

16.    As noted in the Longobucco Declaration, from August 14, 2019 until the Filing Date, a total of 440 actions (the "CVA Actions") were filed in which the Debtor is named as a defendant.  The Debtor proposed a global settlement and mediation program in the context of those actions pending before New York State Supreme Court Justice L. Michael Mackey to address the claims of the CVA Claimants.  While efforts were made by all concerned, including Insurers, to reach agreement and begin the process of evaluating the claims of the CVA Claimants and

7

determining and providing compensation to the victims of sexual abuse, the parties were not able to agree on terms for such as process. Impending trial dates quickly following the parties' consideration of the mediation program in several of the CVA Actions compelled the Debtor to file the within Petition to preserve its assets for the benefit of the claims of the CVA claimants and the constituencies served by the Debtor as well.

17. Notwithstanding its filing, the Debtor has not, and does not, seek to deny CVA Claimants or those asserting claims under the Adult Survivors Act from telling their stories of abuse and is not attempting to avoid its responsibilities or obligations to the CVA Claimants or other survivors. In that regard, and as noted in the Longobucco Declaration, the Debtor has instituted several programs to facilitate reporting of claims of sexual abuse, to evaluate those claims and provide compensation to the victims of abuse. The Debtor publicly discloses the names of clergy against whom allegations of abuse have been credibly established and has taken steps to remove clergy who have been found to be credibly accused of committing acts of sexual abuse from active ministry and, in some cases, laicizing[5] clergy. The Debtor encourages anyone claiming sexual abuse by anyone connected to the Debtor to report such acts to the appropriate civil and criminal authorities for review and determination whether criminal charges can be lodged against the perpetrators.

18. By its bankruptcy filing, the Debtor hopes for a prompt process resulting in confirmation of a plan of reorganization that provides for a process for the assertion and resolution of claims of child sexual abuse and a source for compensating the victims of that abuse, while also permitting the Debtor to continue its mission of serving members of the faith community and providing educational and social services for those dependent on programs provided, sponsored or

---

[5] Laicization is the act of removing the authority of a cleric to exercise the powers of holy orders, effectively rendering him a lay person.

supported by the Debtor. As noted, the Debtor does not have unlimited resources and a prolonged Chapter 11 process will deplete those resources by payment of fees and costs associated with the process at the expense of equitably providing for the victims of sexual abuse. While approximately 50 out of the approximately 440 CVA Actions filed have been settled to date, thereby providing compensation to some of the CVA Claimants, the absence of a stay of the CVA Actions risks exhausting the funds available to both provide compensation to CVA Claimants and ensure the Debtor has sufficient funds to continue its ministry and mission. Piecemeal settlements of the CVA Actions will also likely result in inequitable distributions to CVA Claimants depending on when those actions are scheduled for trial. In order to balance those competing constituencies, the Debtor's leadership has determined that pursuing a reorganization plan through Chapter 11 serves that purpose, with the *caveat* that the prompt confirmation of a plan is in the best interests of all parties and will provide the child victims compensation for their claims and injuries.

### FIRST DAY MOTIONS[6]

19. Simultaneously with the filing of the Petition, the Debtor has filed certain motions (the "First Day Motions") requesting relief on an interim and final basis which are integral to maintaining the Debtor's day-to-day operations. It is respectfully submitted that, absent consideration and approval of the relief sought in the First Day Motions on an expedited basis, the Debtor will be severely and adversely affected in continuing its ongoing and necessary functions, including: ensuring that payment of its' employee wages and benefits, including health insurance and retirement contributions continues uninterrupted; insurance policy premiums continue to be paid to maintain insurance coverages; the Debtor's banking and cash management systems remain in place to avoid interruption in the flow of funds necessary to fund the Debtor's ongoing

---

[6] Following is a summary of the relief requested in the respective motions. Parties should review the motions themselves for the full scope of the relief sought therein.

9

operations; ensuring utility services are not interrupted during the pendency of the case; and that procedures are in place to protect the identities of CVA Claimants and Confidential Information that may be filed during the pendency of the case in the petition schedules and statements, pleadings and proofs of claim that would otherwise require that CVA Claimants be identified. Accordingly, I offer the following in support of the First Day Motions.

**A.    Motion for Order to File Portions of Schedules, Statement of Financial Affairs, Mailing Matrix, Certain Certificates of Service and Other Pleadings Under Seal**

20.    The Debtor respectfully requests that the Court enter interim and final orders permitting portions of the Schedules, Statement of Financial Affairs, mailing matrix, certain certificates of service and other pleadings under seal.

21.    As noted above, the Debtor was named as a defendant in approximately 440 lawsuits pending primarily in New York State Supreme Court, Albany County asserting claims under the CVA.  While the Debtor has a number of trade creditors with which it does business in the ordinary course and to which it owes money, and while a number of CVA Actions have been resolved and settled prior to the Filing Date, the majority of the Debtor's creditors are CVA Claimants.

22.    Both the Debtor-sponsored programs for consideration of claims of abuse and the pending state court actions provide that CVA Claimants' identities will be kept confidential and, with respect to the state court actions, often are filed by plaintiffs using pseudonyms to protect their privacy.

23.    Based on the nature of the claims, to avoid causing undue embarrassment or hardship to the CVA Claimants and to create a process that encourages abuse victims to participate in a process for asserting their claims while preserving their privacy, it is respectfully submitted that requiring schedules, pleadings and other documents filed in the case that would otherwise

include information identifying the CVA Claimants or disclosing Confidential Information instead be filed under seal.

24.    The Debtor respectfully submits that entry of interim and final orders granting the relief sought in this motion is warranted.  As part of the process to protect the CVA Claimants' identities, the Debtor proposes a method to provide notice of the filing of this case and all other relevant pleadings to the CVA Claimants as required by the Code and Federal Rules of Bankruptcy Procedure.

25.    Specifically, the Debtor proposes to file a list of the names and addresses or other contact information for the CVA Claimants with the Court Clerk under seal.  Subject to Court approval, CVA Claimants who have appeared through counsel shall receive notice of the filing of the Petition and any other pleadings required to be served on them through their counsel.  CVA Claimants who have filed claims with the Debtor but who have not commenced a lawsuit or otherwise appeared through counsel shall receive notice of the filing and necessary pleadings directly, but without providing any other party with their identities or addresses.

26.    The Statement of Financial Affairs required to be filed in the case requires that pending lawsuits and other proceedings pending against the Debtor be disclosed.  Such disclosure includes the case caption, case number and other information that may or would identify the CVA Claimants in those actions to the extent that any such actions were commenced by plaintiffs using their own names.

27.    Rule 1007(a)(1) requires the Debtor to file a mailing matrix including the names and addresses of all creditors and parties in interest.  By this motion, the Debtor proposes to file with the Clerk the mailing matrix including the names and addresses of CVA Claimants under seal, with a redacted version included on the docket for parties to access to effect service of

11

pleadings in the case.

28.    Given the number of CVA Claimants, the Debtor expects to retain a claims agent to receive and track proofs of claim filed in the case as well as to assist with noticing and solicitation of ballots at the appropriate time with respect to the plan confirmation process.  Any such claims agent shall be required to maintain the anonymity of the CVA Claimants as well.

29.    In addition, the Debtor and other parties in the case are required to file certificates of service with the Court indicating that notice requirements under the Code and Rules have been complied with regarding motions, pleadings and other documents filed in the case.

30.    By this motion, the Debtor is requesting that it be permitted to redact from those certificates of service the names and addresses of CVA Claimants served with those documents.

31.    It should be noted that, by this motion, the Debtor is not seeking to redact or otherwise protect the names of any clergy or others associated with the Debtor who have been credibly determined to have committed acts of sexual abuse.  However, in order to reduce the risk of disturbances of the peace or acts of vandalism against those credibly accused of sexual abuse, the Debtor respectfully requests that it be permitted to redact the addresses for those persons credibly accused and the names and addresses of those against whom claims have been made but who have not been credibly determined to have committed acts of sexual abuse from filings with the Court.  Unredacted certificates of service would be filed with the Court under seal.

**B.    Motion Pursuant to 11 U.S.C. §105(a) and 363(b) for Interim and Final Orders to (a) Pay Pre-Petition Compensation; (b) Pay and Honor Medical and Other Expenses; (c) Continue Employee Benefit Plans; (d) Maintain Existing Payroll Service; and (e) Authorize and Direct Financial Institutions to Honor and Process Certain Checks and Transfers**

32.    The Debtor respectfully requests that the Court enter interim and final orders authorizing, but not directing, the Debtor to (a) pay prepetition compensation; (b) pay and honor

medical and other expenses; (c) continue employee benefit plans; (d) maintain the existing payroll service; and (e) authorize and direct financial institutions to honor and process certain checks and transfers.

33.     Continuity and maintenance of the Debtor's workforce is essential to the uninterrupted provision of services and programs the Debtor provides to its community and in furtherance of its spiritual mission as well as to the smooth transition of the Debtor to a debtor in possession under Chapter 11 of the Code.  In addition to fulfilling its mission, Debtor employees provide critical financial, risk management, evangelization, communications, pastoral services, building maintenance and related administrative services to those offices and constituents receiving services and benefiting from Debtor programs.  Absent retention of the employees who provide these vital services, the recipients would suffer immediate and irreparable harm.

34.     Currently, the Debtor has approximately 75 employees including lay persons and clergy and Religious (collectively, "Employees"), consisting of 25 salaried employees and 50 employees compensated on an hourly basis.

35.     Many Employees likely rely on their income from the Debtor for their sole source of support and to provide for themselves and their families.  Any interruption in payment of wages or provision of benefits would have an immediate and dramatic impact on the Employees and their families and dependents.  Accordingly, it is respectfully submitted that continuity of payment of pre-petition wages and benefits incurred in the ordinary course of the Debtor's operations is essential to avoid any hardship to the Employees or their families and dependents and to ensure the continuity of the Debtor's workforce.

36.     In order to minimize or avoid such hardship, the Debtor respectfully requests that it be permitted, but not obligated, to (i) pay and honor, in its sole discretion, pre-petition claims

for wages and compensation, reimburse business-related expenses and pay health insurance and other employee benefits the Debtor provides to its Employees in the ordinary course of its operations, as more fully set forth herein; (ii) pay all costs of administration of employee compensation and benefit programs; continue payment of wages and maintain benefits to Employees incurred on and after the Filing Date; (iii) withhold and remit all deductions from wages including payroll and related taxes and other deductions including voluntary Employee contributions to retirement plans and other withholdings as the Debtor is obligated to collect and remit to any third-parties; (iv) maintain its existing payroll service; and (v) authorize and direct financial institutions to honor and process certain checks and transfers.

### 1.  Wages.

37.      Employees are paid bi-weekly in arrears on the Friday of the week following the end of the pay period for which compensation is being paid (the "Compensation").  As a result of the filing of the Petition, there are 12 days of the pending pay period that constitute pre-petition wages, while the remaining compensation due will be incurred post-petition.  The Debtor's bi-weekly gross payroll is approximately $99,000.00, from which withholding taxes and other deductions are paid.

38.      Outstanding pre-petition compensation due is estimated in the approximate amount of $84,857.00[7]. 11 U.S.C. §507(a)(4) provides administrative priority treatment for unsecured employee wage claims owed to each employee in an amount not in excess of $13,650.00 earned within 180 days prior to the Filing Date.  Based on a review of the applicable payroll records, the Debtor does not belief that any employee is owed pre-petition wages in excess of the statutory cap pursuant to 11 U.S.C. §507(a)(4).  As a result, the Debtor does not request authority to pay any

---

[7]  $99,000.00/14=$7,071.43 x 12 days pre-petition.

NH2023-2106082335-777307

wage claim in excess of the statutory cap.

39.     Based on a review of Debtor payroll records, the unpaid pre-petition wage claims result from the timing of the filing of the Petition relative to the current pay period as of the Filing Date and due to the fact that the Debtor pays its payroll in arrears.  In addition, there may be some outstanding payroll checks which were issued pre-petition but which were outstanding as of the Filing Date, or were presented or deposited prior to the Filing Date but were not processed prior to the Filing Date.

## 2. Expense Reimbursements.

40.      From time to time, Employees may incur expenses related to the performance of their work on the Debtor's behalf but which they have paid with their personal funds.  In such instances, the Debtor has a process in place for the submission of requests by Employees for reimbursement of those expenses. As of the Filing Date, the Debtor owed $4,824.21 to Employees on account of outstanding reimbursement requests (the "Expense Reimbursements").  In addition, there may be outstanding reimbursable expenses owed to Employees for which reimbursement requests have not yet been made and which may be submitted after the Filing Date.

41.     Employees incur such expenses with the understanding and expectation that the Debtor will reimburse those Employees on account of such expenses.  Through the process for submission of reimbursement requests, the Debtor ensures that requested reimbursements are properly for expenses Employees incurred for the Debtor's benefit or in furtherance of the Employees' work on the Debtor's behalf.  As a result, in order to ensure that Employees are not burdened with paying expenses that are properly those of the Debtor, it is respectfully submitted that the Debtor be authorized, but not directed, to reimburse business expenses incurred by Employees for the Debtor's benefit with payment made by the Debtor in its sole discretion.  It is

further respectfully requested that the Debtor be permitted (i) to continue on a post-petition basis to pay or reimburse business expenses incurred by Employees on the Debtor's behalf or for its benefit in accordance with its pre-petition practices and policies; (ii) to modify its expense reimbursement policies or procedures as it deems appropriate; and (iii) to pay and reimburse all such business expenses incurred and outstanding prior to the Filing Date.

### 3.   Employee Benefit Plans.

42.     The Debtor provides its eligible Employees and their dependents, as well as administrative services for such benefits provided to Non-Debtor Entities' employees, with various benefits ("Benefits") as set forth more fully below:

### a.   Health Insurance.

43.     The Debtor offers its eligible employees health insurance through RETA (Blue Shield) ("RETA") through single, married or family coverage.  Employees contribute between 17%- 35% toward the cost of the premiums depending on the type of coverage, with the Debtor paying the difference, except for priests employed by the Debtor for whom it pays 100% of their health insurance premiums.  In addition to eligible Debtor employees, in order to take advantage of economies of scale and increased buying power as a result of a greater number of participants, eligible employees of Non-Debtor Entities are able to purchase coverage through the RETA.  The Debtor pays the RETA premiums on a monthly basis.  Non-Debtor entities are billed for their respective share of the RETA premiums on a monthly basis and pay the Debtor their portion of the premiums for participating Non-Debtor Entities' employees and the Non-Debtor Entities' share of the premium costs from withholdings from their employees' wages and the Non-Debtor Entities' funds.  Annual RETA premiums total approximately $6.9 million, of which the Debtor and the Non-Debtor Entities pay approximately $5.4 million, while eligible Debtor and Non-

16

Debtor Entities' employees pay approximately $1.5 Million from funds withheld from their wages.

**b. Dental Insurance.**

44.     The Debtor offers its eligible employees dental insurance through Aflac.  Premiums are paid entirely by the participating employees.

**c. Paid time off/Vacation.**

45.     Eligible Debtor employees receive an annual grant of personal time, and also accrue sick leave in accordance with New York State paid sick leave requirements, but are not paid out for unused personal or sick hours upon termination.  Eligible Debtor employees accrue vacation time from the date of hire, up to a maximum of six weeks, and upon termination receive payment for unused vacation accruals up to a maximum of six weeks. The Debtor estimates that its employees have accrued vacation time with an aggregate value of $130,150.00.  However, this is not a current obligation owed to employees, and based on past practice, the Debtor reasonably expects that a significant portion of accrued vacation time will be used by its employees over the course of a calendar year.  Employees using vacation time continue to accrue during their time off.  Employees are not able to receive cash compensation for accrued vacation time until their employment is terminated.  Based on a review of the Debtor's financial records, it does not appear that any employee is eligible to receive cash compensation for accrued vacation time in an amount that would exceed the cap imposed pursuant to 11 U.S.C. §507(a)(4) on account of accrued, pre-petition vacation time. The Debtor reasonably anticipates that most employees will utilize vacation time during the course of a calendar year.  As a result, the Debtor does not anticipate that vacation time will have a material effect on the Debtor's post-petition payroll.

**d. Long Term Disability.**

46.     The Debtor provides eligible employees with Long Term Disability Insurance

NH2023-2106082335-777307

through The Business Council Insurance Fund. The Debtor pays approximately $102,000.00 in annual premiums for this coverage with Non-Debtor Entities billed for their approximate share of premiums based on payroll.

### e. Retirement.

47.     The Debtor has a contributory multi-employer defined benefit pension plan pursuant to Internal Revenue Code §414(e) (the "Employee Retirement Plan") which covers substantially all lay employees of the Debtor, as well as lay employees of the Non-Debtor Entities who have elected to participate in the Employee Retirement Plan. Employees who work at least 20 hours per week (1,000 hours per year) are eligible to participate in the Employee Retirement Plan at their own cost of two (2%) based upon their actual pay. The Debtor has established employer contributions based on seven (7%) percent of employees' salaries upon completion of three (3) years of the respective employee's service with the Debtor and participating Non-Debtors. Total pension expense recognized by the Debtor for its employees participating in the Employee Retirement Plan was $54,500 for the six months ending December 31, 2022. The Debtor's policy is to generally fund Employee Retirement Plan costs as they accrue.

48.     In addition, the Debtor sponsors a contributory defined benefit plan covering any priest ordained and serving within the geographic region of the diocese or any priest incardinated into the diocese (the "Clergy Retirement Plan"). Organizations participating in the Clergy Retirement Plan include the Debtor and Non-Debtor Entities. The Clergy Retirement Plan is funded from a contribution from the pay of participating priests and payments made to it by the Debtor and participating Non-Debtor Entities. Total pension expenses paid by the Debtor into the Priest Retirement Plan was $25,200 for the six months ending December 31, 2022. The Debtor's policy is to fund Priest Retirement Pension costs as they accrue.

18

**f. Life Insurance**

49.     The Debtor provides a life insurance program for the benefit of its lay employees with a death benefit equal to one-times salary up to a maximum of $50,000.00.  Non-Debtor Entities' employees are eligible to participate in this benefit with the Non-Debtor Entities billed for their approximate share of premiums based on their payroll.

50.     The Debtor provides life insurance for priests employed by the Debtor.  In addition, priests assigned to Non-Debtor Entities including parishes are provided life insurance as well, with a death benefit of  $10,000.00 up to age 65 with a reduced death benefit from 65-70 in the amount of $6,500.00 and from age 70-75 in the amount of $5,000.00.  The Debtor bills the Non-Debtor Entities by whom the priests are employed for the cost of those premiums.

**g. Flexible Spending Plan**

51.     The Debtor offers a Flexible Spending Plan for its employees consisting of pre-tax withholdings from employee salaries up to $3,050.00 on an annual basis for payment of allowable expenses under applicable provisions of the Internal Revenue Code and Regulations.

**h.  Workers' Compensation**

52.      The Debtor provides workers' compensation benefits to all of its employees.  Coverage is afforded under the Debtor's self-insured workers' compensation plan.  The Debtor obtained a letter of credit for $4,316,716.00 from Trustco Bank (the "Trustco LOC") for the benefit of The New York State Workers' Compensation Board.  The Debtor has pledged monies on deposit with Trustco Bank in support of the Trustco LOC.  The Trustco LOC automatically renews annually.

53.     The Debtor's failure to maintain workers' compensation coverage and to

NH2023-2106082335-777307

collateralize the Trustco LOC pursuant to New York State law would expose it to potential administrative or legal actions against the Debtor and its officers.  Further, the Debtor's failure to maintain workers' compensation coverage would expose the Debtor to direct claims by employees for injuries suffered during the course of their employment.

54.     The Debtor respectfully requests that it be permitted to maintain its workers' compensation insurance program in the manner in which it operated prior to the Filing Date, including, in the exercise of its business judgment, the ability to contest and/or pay claims that arose pre-petition, including payment to any insurers as a result of payment of claims or for payment of lost wages obligations, as such payments come due in the ordinary course of the Debtor's operations.

### i.  Unemployment Insurance

55.     Unemployment insurance is provided through an unemployment trust administered by a third-party administrator.

56.     Self-insurance premiums are paid to the plan trustee, Trustco Bank.

57.     In order to take advantage of economies of scale and because smaller Non-Debtor Entities may not be able to adequately provide unemployment insurance for a small number of employees, Non-Debtor Entities participate in the Debtor's unemployment self-insurance plan. The Debtor and each Non-Debtor Entity pays premiums to Trustco Bank based on a survey of their respective payroll.

58.     The Debtor is statutorily obligated to maintain unemployment insurance for the benefit of its employees.  Similarly, Non-Debtor Entities are also required to provide unemployment insurance for their employees.  As noted above, pooling resources to fund the self-insured unemployment insurance for the Debtor and Non-Debtor Entities provides a mechanism

20

to ensure that employees are adequately covered for their unemployment insurance obligations and permits smaller parishes and similar Non-Debtor Entities to obtain unemployment insurance that would otherwise be substantially more expensive or impossible to obtain directly.

59.     The Debtor respectfully requests that it be permitted to continue to fund its own self-insured unemployment insurance obligations as well as to continue to administer the self-insured unemployment insurance program for Non-Debtor Entities, including billing and collecting the Non-Debtor Entities' required contributions to the unemployment insurance program.

### j.   Payroll Deductions (Employee share/contributions)

60.     The Debtor is required by law to withhold federal and state income, Social Security and Medicare taxes (collectively, "Employee Deductions and Withholdings") from Employees' wages and pay those withheld funds over to the appropriate taxing authority.  The Debtor withholds and remits the Employee Deductions and Withholdings in the approximate amount of $19,500.00 per bi-weekly pay period in State and federal tax withholdings, Social Security and Medicare taxes and in the approximate amount of $12,500.00 in deductions from Employees' wages for health and dental insurance premiums, Flex Account savings, New York Personal Family Leave, charitable donations, employee contributions to the Employee Retirement Plan and other pre-tax deductions per each bi-weekly pay period.  In addition, the Debtor is obligated to pay its share of Social Security and Medicare taxes (the "Employer Payroll Taxes") each respective bi-weekly pay period.  On average, the Debtor's Employer Payroll Taxes are approximately $7,200.00 for each bi-weekly pay period.

61.     It is the Debtor's position that the Employee Deductions and Withholdings constitute trust funds while in the Debtor's possession and, therefore, are not property of the

Debtor's bankruptcy estate. Therefore, the Debtor seeks the authority, but not the direction, to remit the Employer Payroll Taxes and Employee Deductions and Withholdings accrued and withheld but not paid prior to the Filing Date to the appropriate third-parties and taxing authorities. Further, the Debtor also respectfully requests that it be authorized, but not directed, to continue to remit the Employer Payroll Taxes and the Employee Deductions and Withholdings on a post-petition basis, consistent with its pre-petition conduct and in the ordinary course of its operations. The Debtor's third-party payroll provider, Paycor, collects and remits employee and employer tax withholdings each biweekly pay period.

62. The Debtor further respectfully requests that the Court authorize and direct the banks and financial institutions with which the Debtor maintains its accounts to receive, process, honor and pay all pre- and post-petition transactions for transfer of the Employee Deductions and Withholdings requested or issued by the Debtor, whether pre- or post-petition. It is further respectfully requested that the Debtor be authorized, but not directed, to issue replacement checks or effect ACH or other electronic disbursements of funds for payment of the Deductions or Employee Withholdings that may be, or may have been, rejected or dishonored pre- or post-petition.

63. I have reviewed the Debtor's books and records and have determined that no Employee is entitled to payment of Compensation or Benefits in excess of the statutory cap in the amount of $13,650.00 for such priority claims pursuant to 11 U.S.C. §507(a)(4) or (5). The Debtor requests the authority, but not the direction, to pay Compensation and Benefits consistent with the limitations of §§507(a)(4) and (5), which limits such priority claims to wages and benefits earned within 180 days prior to the Filing Date and up to the maximum combined amount of $13,650.00.

64. Therefore, the Debtor respectfully requests that the Court enter interim and final

orders authorizing, but not directing, the Debtor to pay Compensation, Benefits, Expense Reimbursements, Employee Deductions and Withholdings and Employer Payroll Taxes in the ordinary course of its operations.  It is further respectfully requested that the Debtor be authorized, but not directed, to continue to pay Compensation, Benefits, Expense Reimbursements, Employee Deductions and Withholdings and Employer Payroll Taxes Benefits post-petition, maintain the Debtor's use of its pre-petition payroll service and authorize and direct financial institutions to honor and process certain checks and transfers.  It is respectfully submitted that the requested relief is warranted so as to avoid any disruption in the services and ministries provided by the Employees to the Debtor and those it serves and to ensure a smooth transition into Chapter 11.

**C. Motion for Interim and Final Orders (I)(a) Authorizing, But Not Requiring Continued Use of Pre-Petition Bank Accounts, Banking Practices, Cash Management System and Business Forms; (b) Maintaining Investment Accounts and Practices; (c) Continuing Using Credit Cards in the Ordinary Course; (II) Granting Limited Relief from the Requirements of 11 U.S.C. §345(b)**

65.    By this motion, the Debtor requests that the Court enter interim and final orders (i) authorizing the continued use post-petition of the Bank Accounts; (ii) treating the Bank Accounts as debtor in possession accounts; (iii) authorizing the Debtor's continuing use of its business forms, including, but not limited to, letterhead, invoices, statements and similar business forms and waiving the requirement that such business forms include the term "debtor in possession"; (iv) allowing the continuation and maintenance of pre-petition investment accounts and practices; (v) authorizing the continued use of credit cards for ordinary course of operations transactions; and (vi) granting a limited relief from the requirements of 11  U.S.C. §345(b).

NH2023-2106082335-777307

I.   **Authorizing, but not Requiring, Continued Use of Pre-Petition Bank Accounts, Banking Practices, Cash Management System and Business Forms, Maintain Investment Accounts and Practices and Continue Using Credit Cards in the Ordinary Course**

a.   **Pre-Petition Bank Accounts, Banking Practices, Cash Management System and Business Forms**

66.   In the ordinary course of its operations, the Debtor receives or deposits funds to, and disburses payments and funds from, the Bank Accounts.  Additionally, in the ordinary course of its business, the Debtor pays or transfers funds by check, wire transfer or ACH for purposes related to its operations and provision of services among its accounts as necessary to satisfy the ordinary, ongoing expenses for the Debtor's operations including: payroll, withholding taxes, employee benefits, insurance coverages (including general liability, automobile, real property, worker's compensation, health insurances, ordinary course of business vendors and funds to support the various ministries and offices of the Debtor providing vital spiritual and social services to the constituencies served by the programs maintained by those ministries and offices (collectively, the "Cash Management System").

67.   The Debtor maintains depository relationships with the following banking institutions: Berkshire Bank, Citizens Bank, and KeyBank (the "Depository Banks") for the following accounts (collectively, "Bank Accounts"):

| Account Title | Depository Bank | Last four digits of account number |
|---|---|---|
| Catholic Committee on Scouting | Berkshire Bank | 1383 |
| Lay Hospitalization | Citizens Bank | 0998 |
| Bishop's Appeal | KeyBank | 6223 |
| Bishop's Charity-EBS | KeyBank | 0991 |
| Bishop's Charity-HJH | KeyBank | 0356 |

24

| Charismatic Renewal | KeyBank | 7142 |
|---|---|---|
| Consultation Center of the Roman Catholic Diocese of Albany | KeyBank | 0979 |
| Consultation Center of the Roman Catholic Diocese of Albany | KeyBank | 0566 |
| Custodian Funds | KeyBank | 1277 |
| Formation for Ministry Program | KeyBank | 8958 |
| Insurance | KeyBank | 5781 |
| Operating | KeyBank | 4755 |
| Consultation Center-Holy Ground | KeyBank | 9249 |
| Seminary | KeyBank | 7841 |
| Program Ministries | KeyBank | 1900 |
| Youth Ministry (OECFL) | KeyBank | 5804 |

68.     By this motion, the Debtor respectfully requests that it be permitted to continue to maintain the Bank Accounts at the Depository Banks.  The Debtor further respectfully requests that the Depository Banks be permitted to charge the Bank Accounts for any undisputed fees or service charges specifically provided for under the respective account documentation for each account due but not yet paid as of the Filing Date and, further, that the Depository Banks be authorized and directed to receive, process, honor and pay (i) all post-petition checks, drafts, wire transfers or other electronic payments (provided there are sufficient funds on deposit to cover the transactions); and (ii) honor and pay any pre-petition checks or other transactions for which the Court has authorized payment pursuant to a separate order providing for such relief.

69.     The Debtor maintains a cash management system which integrates the Debtor's Bank Accounts with KeyBank to facilitate receipt of funds and payment of its day-to-day operating expenses.  In addition to funds received from the Diocesan Appeal, the Debtor receives income from insurance premiums paid by Non-Debtor Entities participating in the Debtor's insurance plans, interest and dividend income, net gains from investments and the value of net assets released

from restrictions.

70.     Under the terms of the relevant account documentation, the Depository Banks impose certain service charges or fees (collectively, "Service Charges") for account maintenance or transaction fees. Such Service Charges are a cost of maintaining the Bank Accounts.  Further, the relevant account documentation permits the Depository Banks to setoff the Service Charges against funds on deposit with the banks.  Such setoff rights are superior to claims of unsecured creditors.  The Debtor also seeks the authority, but not the direction, to pay any outstanding pre-petition Service Charges.  As noted, the relevant account documentation provides for payment of the Service Charges and the Depository Bank's right to set off those charges against funds on deposit in the Bank Accounts.  Accordingly, the Debtor respectfully requests that it be authorized, but not directed, to pay any accrued but unpaid pre-petition Service Charges, and that the automatic stay provisions of 11 U.S.C. §362(a) be deemed modified as necessary so as to permit the Depository Banks to set off the Service Charges from the Bank Accounts.

71.     All of the provisions of the existing deposit agreements, account documentation and related agreements between the Debtor and the Depository Banks, including, without limitation, the termination and fee provisions, shall remain in full force and effect subject to the terms of this Interim Order.

72.     From time to time, the Debtor transfers funds between the Bank Accounts to facilitate payment of expenses or other obligations of the entities for which the Bank Accounts are maintained.  Such transfers are for obligations arising in the ordinary course of the Debtor's operations.  Accordingly, the Debtor respectfully requests that it be permitted to continue its pre-petition practices of its Cash Management System including processing debit, ACH and wire transfers to and from its Bank Accounts.  The Debtor has developed payment processing systems

on which its vendors have come to rely and respectfully requests that it be permitted to continue those deposit and transfer methods post-petition.

73.     The Debtor also has a stock of business forms including checks, invoices and payment requests, letterhead and similar documents for correspondence (collectively, "Business Forms") that it utilizes in the ordinary course of its operations.  Except for the inclusion of the term "debtor in possession" on those forms, they remain accurate and useful to the Debtor in carrying out its operations in the ordinary course.  Requiring the Debtor to discontinue using its Business Forms would cause unnecessary delays in the Debtor's timely payment of its expenses, invoicing for payments and the general continuity of its fulfillment of its spiritual, organizational and temporal acts to those it serves.  In addition, the Debtor would incur unnecessary costs in disposing of otherwise valid and useful forms and the expense and delay attendant to replacing those forms.

### b.     Maintain Investment Accounts and Practices

74.     **Investment Accounts.**  In addition to its Bank Accounts, the Debtor maintains an interest in the following investment accounts (the "Investment Accounts"), as more fully described below.

### i.   The Foundation of the Roman Catholic Diocese of Albany, New York, Inc. ("The Foundation")

75.     The Foundation was incorporated in 1995 for the purpose of supporting, whether directly or indirectly, the religious, charitable and educational mission of the Catholic Church, as carried out by the Debtor and Non-Debtor Entities, Catholic organizations and agencies and the programs and activities of all such organizations.

76.     The corporation is managed by a board of directors consisting of not less than three nor more than five members, including the Bishop, Vicar General and Chancellor of the diocese by virtue of their offices.

27

77. The Debtor holds an interest in a pooled investment organized by the Foundation for the purpose of offering the Debtor and Non-Debtor Entities the opportunity to invest collectively to maximize investment opportunities and returns consistent with duties of stewardship following the mandates of Canon Law and the State of New York.

78. The investments are managed by Bank of America's professional investment advisors and are overseen by the Foundation's Board of Directors. In addition to the Debtor, only parish corporations and schools are eligible to deposit funds with the Foundation for investment purposes. Income is allocated to investors based on the percentage of the net asset value of their individual funds to the total investment balance. Separate accountability is maintained for all entities who have funds on deposit in the pool of investments.

79. As of December 31, 2022, the Foundation held a total of $8,141,862 of Debtor funds.

### ii. Diocesan Investment and Loan Trust ("DILT")

80. In addition to its investments held by the Foundation, the Debtor is a depositor to the Diocesan Investment and Loan Trust ("DILT"). Separate accountability is maintained for all entities who have funds on deposit in the pool of investments.

81. The DILT was established on April 20, 2007, pursuant to the terms of that certain Declaration of Trust (the "DILT Declaration") executed by the then-Vicar General of the diocese, is a not-for-profit organization, is managed by an advisory board to the trustee and is separate from the Debtor although, as noted, the Debtor is a depositor to the DILT. The Vicar General of the diocese is automatically the trustee for the DILT, by virtue and in the capacity of the ecclesial office held.

82. As with the Foundation, the DILT may receive deposits in trust from, and limited

NH2023-2106082335-777307

to, the Debtor and qualified tax-exempt organizations within its canonical purposes as defined in

Chapter 283 of the Laws of 1941, including any qualified tax-exempt church or religious,

educational or charitable organization or corporation canonically associated with the Debtor, or

any organization or corporation holding funds for the benefit of the foregoing or for promoting

any other purposes for which any of the foregoing were formed for the purpose of supporting

ministries of the Debtor and its parishes, charitable and educational institutions.

83.     Pursuant to the DILT Declaration, the Trustee shall establish the annual rate of

return payable to depositors. As of December, 2022, the DILT pays interest at the rate of 2% on

deposits of the participating Non-Debtor Entities and to the Debtor. The terms of the DILT provide

that the annual interest rate paid to depositors is discretionary and depends, in part, on market

performance of the investments held in the DILT. The Trustee may also authorize individual loans

to diocesan ministries, programs and institutions. Pursuant to the DILT Declaration, the excess

earnings of the DILT above the fixed rate of interest payable to depositors shall be deemed a

donation by the depositors to the DILT and remain property of the DILT. The DILT maintains

discrete accounting with respect to each depositor's interest in the DILT.

### iii.     Unemployment Fund Investment Fund/ Trust

84.     As noted above, the Debtor maintains assets in a non-discretionary trust for the

reimbursement of unemployment benefits to the State of New York. The assets are maintained in

the name of the Debtor for its benefit and the benefit of participating Non-Debtor Entities.

### iv.     Other Debtor Investment Holdings

85.     The Debtor also maintains, and has pledged, an account with Trustco Bank to

secure a letter of credit in the amount of $4,316,716.00 issued by Trustco Bank for the benefit of

The New York State Workers' Compensation Board with respect to the Debtor's workers'

compensation insurance program.

### v.   Restricted Funds

86.     Permanently restricted funds of the Debtor, except for the Seminary Endowment Fund (which is invested with Bank of America), are invested with the Foundation.   For endowments invested in the Foundation, the Debtor applies the Foundation's Investment and Distribution Policy (the "Policy").   In accordance with the Policy, distributions are determined by the Board of Trustees for the Foundation subsequent to year-end based upon the Policy and spending rate approved by the trustees.   The Seminary Endowment Fund spending policy has been determined to be limited to the annual investment earnings of the underlying investments.   As noted above, these endowed funds are donor-restricted as is the use to which income from these endowments may be utilized.

87.     Through its investment advisors, the Debtor has developed a long-term strategy to manage its funds for the benefit of Debtor programs or the particular programs or services designated by donors in connection with their donations.

88.     It is respectfully submitted that maintaining the current investment advisors and investment strategies developed over a number of years is in both the Debtor's and its creditors' best interests.   Canon Law compels the Debtor to be a steward of its assets for the benefit of those it serves.   The Debtor has developed a conservative approach to manage its assets so as to be able to ensure that it is able to provide services to the larger community in which it operates and for those whom it serves.

### c.   Continue Using Credit Cards in the Ordinary Course

89.     In the ordinary course of its operations, the Debtor maintains credit cards issued by KeyBank and American Express (the "Credit Cards") to manage its business expenses.   The Debtor

has one credit account with American Express for which three cards have been issued. Similarly, the Debtor maintains one credit account with KeyBank with multiple cards issued to Debtor employees. Such cards are utilized for payment of vendor claims and expenses related to the particular employees holding the cards for payment of expenses incurred in furtherance of such employees' function and mission on the Debtor's behalf. The aggregate limit of the Debtor's KeyBank credit account $27,500, although individual cards held by Debtor employees generally have substantially lower available credit limits. The American Express account does not have a pre-set limit. The Debtor incurs monthly aggregate charges on these accounts of $9,000.00, with balances accrued during a given monthly period paid in full when due so as to avoid the accrual of interest expenses. The Debtor reasonably estimates that the outstanding balance due on the Credit Cards as of the Filing Date will be $0.00.

90.    In order to avoid disruption to the Debtor's ongoing operations, the Debtor has requested that KeyBank and American Express consent to the maintenance of the Credit Cards. Further, the Debtor respectfully requests that the Court authorize the Debtor to pay any outstanding balances due on the Credit Cards as of the Filing Date or by the due date for payments under the accounts if they occur after the Filing Date, and that the Debtor be further authorized to continue to use the Credit Cards post-petition and to continue to pay the accrued balances on those accounts in the ordinary course of operations during the pendency of the case.

91.    The Debtor respectfully submits that maintenance of its pre-petition Bank Accounts and Cash Management System is necessary to ensure that the ongoing day-to-day operations of the Debtor are uninterrupted by the filing of the Petition. Tens of thousands of people rely on the services provided by the Debtor every day, including among the most vulnerable in society. Any interruption of the Debtor's ability to provide or fund those services would have an immediate and

deleterious effect on those dependent on those services.  Maintaining the pre-petition Bank Accounts and Cash Management System on a post-petition basis will ensure that those vital and necessary services continue.

92.    If the Debtor was compelled to close its existing Bank Accounts and open post-petition debtor in possession accounts, its ongoing day to day operations would be immediately interrupted and unable to resume until new accounts and cash management systems were established.  Such interruptions would immediately interfere with payroll and benefits for Debtor employees as well as payment of withholdings and taxes to third-parties, delay receipt and deposit of revenues and interrupt receipt of goods and services and payment for same to the Debtor's vendors.  Given the nature of the accounts and the Debtor operations that depend on the continuity of funding and services, it is respectfully submitted that entry of an order authorizing the continued use of pre-petition bank accounts, banking practices, cash management system and business forms is warranted.

93.    The Debtor respectfully submits that entry of interim and final orders granting the within relief requested is warranted so as to avoid any disruption in the Debtor's ongoing day-to-day operations and interruption in the services provided by the Debtor to recipients of those services, which includes those among the most vulnerable in society including the elderly, children, the homeless, and those struggling with substance or alcohol abuse.  Requiring the Debtor to comply with the guidelines of the Office of the United States Trustee which require that pre-petition accounts be closed and re-opened as debtor in possession accounts would cause an immediate and irreparable disruption to the Debtor's provision of vital services to the people and organizations which it serves as well as to its employees who depend on regular and uninterrupted income and the provision and receipt of employee benefits, including health insurance and other

32

employee benefits.  Requiring the Debtor close its pre-petition accounts and open debtor in possession accounts would also interrupt and delay payments to vendors and ordinary course of business creditors which, in turn, would impair the Debtor's ability to perform its day-to-day functions.  Similarly, transfers to third parties for Withholdings and employee and employer portions of taxes would be interrupted and cause the Debtor to default on its statutory obligation to timely and promptly remit such payments.  Delays in payment of insurance premiums would likely cause interruptions or denial of payment for claims for treatment of health conditions to the detriment of Employees and their dependents.

94.    Permitting the Debtor to maintain its existing Bank Accounts will aid in its transition to a debtor in possession under Chapter 11 and ensure continuity of payment of post-petition expenses which, if unpaid, would be entitled to treatment as administrative claims. Similarly, permitting the Debtor to continue to utilize its business forms will avoid delays in issuing checks for payment and invoices for collection as well as correspondence and other communications by the Debtor as may occur in the ordinary course of its operations.  Continuing use of its existing business forms will also avoid the Debtor incurring the unnecessary expense of replacing otherwise useful, appropriate and available business forms.  In comparison, creditors and other parties in interest in the case will not be harmed by the Debtor's maintenance of its Bank Accounts, Cash Management System and Business Forms because it will avoid delays and interruptions of the Debtor's transition to a debtor in possession under Chapter 11 and, ultimately, the development and proposal of a plan of reorganization for the payment of allowed claims of creditors including, in particular, the CVA Claimants.

95.    The Debtor has been made aware of the Operating Guidelines and Financial Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines"),

which provide, *inter alia*, that debtors in possession must close pre-petition bank accounts, maintain

separate accounts for cash collateral and utilize checks and business forms denoting the debtor as a

"debtor in possession", absent a court order to the contrary.

96.     As noted above, requiring the Debtor to close its existing bank accounts and re-

open post-petition debtor in possession accounts would cause an immediate interruption in the

Debtor's ongoing day-to-day operations and those dependent of the Debtor's services.

97.     It is respectfully submitted that excusing the Debtor from strict compliance with

the U.S. Trustee Guidelines with respect to maintaining its Bank Accounts, Cash Management

System and Business Forms will facilitate the Debtor's smooth transition into Chapter 11 with

little or no disruption to its employees or those dependent on its services and programs.

98.     In order to ameliorate any effects of a waiver or modification of the Debtor's

obligations under the U.S. Trustee Guidelines, the Debtor has undertaken steps to ensure that there

is a clear demarcation between the Debtor's pre- and post-petition operations and will specifically

denote in its internal accounting system the Filing Date of the Petition so as to separate pre- versus

post-petition operations.

99.     In addition to maintaining its Bank Accounts and Cash Management System, the

Debtor respectfully requests that it be permitted to maintain and continue its internal accounting

systems and signature authorizations with its depository banks.

## II.     Granting Limited Relief from the Requirements of 11 U.S.C. §345(b)

100.    11 U.S.C. §345(b) provides that

(b) [e]xcept with respect to a deposit or investment that is insured or guaranteed by
the United States or by a department or agency or instrumentality of the United
States or backed by the full faith and credit of the United States, the trustee shall
require from an entity with which such money in deposited or invested-
    (1) a bond-
        (A) in favor of the United States;

34

(B) secured by the undertaking of a corporate surety approved by the United States trustee for the district in which the case is pending; and
(C) conditioned on-
(i) a proper accounting for all money so deposited or invested and for any return on such money;
(ii) prompt repayment of such money and return; and
(iii) faithful performance of duties as a depository; or
(2) the deposit of securities of the kind specified in section 9303 of title 31; unless the court for cause orders otherwise.

101.    In furtherance of its request that it be permitted to maintain its pre-petition investments and account practices, the Debtor respectfully requests that it be relieved of strict compliance with the requirements of 11 U.S.C. §345(b).  The Debtor's management of its investment accounts is subject to applicable provisions of Canon Law as well as the New York Estates, Powers and Trusts Law, the New York Uniform Prudent Management of Institutional Funds Act and the Internal Revenue Code.  Consistent with its statutory stewardship obligations, the Debtor utilizes the services of investment professionals who have developed a conservative investment strategy to ensure that it receives a reasonable return on its investments while limiting the risk of those investments.  It is respectfully submitted that, by continuing those practices and strategies, the Debtor is complying with the intent of §345(b) without the need to incur unnecessary costs of strict compliance with the statute, including the cost of converting a portion of its holdings to cash or government securities, with the concomitant risk of loss of value as a result of such conversion.

102.    Given the Debtor's obligation to manage its finances with the interests of  those it serves as its primary focus, its employment of outside professional financial advisors with its investments held at well-regarded, large and stable financial institutions and its in-house financial management team overseeing the Debtor's day-to-day accounting functions, the costs to liquidate its investments to comply with  §345(b)'s requirement that estate assets  be invested in government

35

securities or the purchase of a bond to secure the Debtor's investments would risk a loss in value, lost opportunity to obtain a greater return than is ordinarily obtained on government securities, incur transaction costs that would further diminish the investments' value and reduce the returns and distributions to the Debtor on which it relies to fund its operations and the programs and services for those it serves.

103.    Debtor personnel would also have to devote time to overseeing the divestment of the Debtor's investment funds and re-investment in government-backed securities or securing a bond to comply with §345(b) which would distract from the vital process of transitioning the Debtor to a debtor-in-possession smoothly and without interruption of its day-to-day operations and provision of programs and services to often the most vulnerable and at-risk members of society.

104.    It is respectfully submitted that that Debtor's current investment plan satisfies the intent of §345(b) to protect the value of the Debtor's investments for its own operational benefit as well as a source of payment to creditors, including CVA claimants. As noted above, (i) the Debtor employs outside, independent financial advisors to counsel the Debtor on investment strategies; (ii) the Debtor's stewardship of its investment accounts is subject to applicable provisions of Canon Law as well as the New York Estates, Powers and Trusts Law, the New York Uniform Prudent Management of Institutional Funds Act and the Internal Revenue Code; (iii) in conformity with its ecclesiastical and statutory duties, the Debtor has developed a conservative investment plan to minimize risk of its investments to provide both income and growth to assist with funding its day-to-day operations as well as the services it provides through its various offices to those in need; (iv) concomitant with its conservative investment strategy, the Debtor's investments are diversified to attempt to minimize risk with a focus on long-term growth and

production of income to assist with funding the Debtor's operations.

105. Permitting the Debtor to maintain its Investment Accounts and Practices will ensure that there is no interruption in the preservation of the Debtor's assets which, to the extent not otherwise restricted, will form the basis of assets available for payment to creditors under the plan.

106. It is respectfully submitted that the Debtor and its estate would be adversely affected if it were required to strictly comply with §345(b). The transaction costs, coupled with the loss of income produced by the current investment strategy and the time necessary for Debtor financial staff and outside financial advisors to effect such transactions would adversely affect the Debtor's finances and ability to continue to operate on a day-to-day basis and ensure continuity of services for those dependent on the Debtor's programs. Liquidation of the Debtor's investments would not be consistent or prudent in light of the Debtor's statutory obligations. Creditors would similarly be adversely affected as the estate would incur the costs of liquidation as well as the loss of income and growth from the current investments. Thus, strict compliance with §345(b) would actually be contrary to that statute's intent of preserving the value of estate assets for the benefit of the debtor-in-possession and creditors.

**D. Motion for Interim and Final Orders (a) Authorizing Continued Maintenance of the Debtor's Insurance Program and (b) Authorizing Payment of Pre-Petition Obligations in Respect Thereof**

107. The Debtor maintains a casualty and liability insurance program (the "Insurance Program") covering its personnel and properties as well as for Non-Debtor Entities that are additional insureds under the applicable polices. The Debtor also provides administrative services overseeing the Insurance Program for the Debtor's benefit as well as for the benefit of Non-Debtor Entities participating in the program. The program itself is administered by a third-party administrator. The Debtor is self-insured for each claim up to certain dollar amounts based on the

NH2023-2106082335-777307

nature of the claim.  The Debtor has purchased insurance coverage to cover claims in excess of the self-insured retention amounts of the respective classes of claims.

### a.   Authorizing Continued Maintenance of the Debtor's Insurance Program

108.    By this motion (the "Insurance Program Motion"), the Debtor requests that the Court enter interim and final orders allowing the Debtor to continue to maintain the Insurance Plan. The Debtor also seeks entry of an order authorizing, but not directing, the Debtor in its discretion, to pay any prepetition claims, premiums, defense costs, obligations and administrative costs related to the Debtor's participation in the Insurance Program, and authorizing Depository Banks to honor checks and other withdrawals, whether for pre- or post- petition periods, for amounts representing payments or reimbursement of claims payable under the Insurance Program.

109.    As set forth more fully in the Insurance Program Motion, the Debtor maintains a casualty and liability insurance program administered by Catholic Mutual Group.   The Debtor is self-insured up to certain claim limits and maintains insurance policies to cover costs of claims which exceed the self-insured limits.

110.    The Debtor's Insurance Program ensures that the Debtor and participating Non-Debtor Entities (collectively, the "Insurance Program Participants") have had adequate insurance coverage at a reasonable price by spreading risk among a large number of participants and leveraging their collective buying power to secure coverage at favorable rates.

111.    More specifically, the Insurance Program currently provides coverage, subject in certain instances to a deductible or self-insured retention ("SIR") for (i) property casualty, (ii) general liability claims, including real property, personal injury, automobile liability, and negligence among others, and (iii) workers' compensation and unemployment.

112.    The Insurance Program is paid by the Debtor on a monthly basis.  Each Insurance

Program Participant is billed on an annual basis for its share of the premium plus its participatory share of the SIR.

113.    The Debtor is self-insured for each claim up to $250,000 for general liability and automobile liability claims, $500,000 for worker's compensation claims, and $1,000,000 for real property claims.

114.    The Insurance Program provides a practical, cost-effective way to manage risk for the Insurance Program Participants under a single, comprehensive insurance program. If the Insurance Plan is not continued, the Debtor, together with each of the Insurance Program Participants, will be forced to purchase separate insurance policies covering each entity and their respective properties. This would result in the Debtor and the other Non-Debtor Insurance Program Participants incurring substantially higher costs to obtain their own individualized insurance (with or without a retention or deductible) than what they are currently assessed under the Insurance Plan. Moreover, without the broad collective risk profile provided by the Insurance Program, certain types of coverage and available coverage limits may simply not be available on an individualized basis or on commercially reasonable terms.

115.    I have been advised by the Debtor's bankruptcy counsel that debtors in Chapter 11 are required to maintain insurance coverage for potential losses, damages or liabilities in order to protect the assets of the bankruptcy estate for the benefit of the Debtor and its creditors and to ensure coverage for potential damages or losses arising post-petition which would otherwise be liabilities of the Debtor or its estate and which would be accorded treatment as administrative claims pursuant to 11 U.S.C. §503(b).  I have been further advised that any such administrative claims would be entitled to priority for payment ahead of pre-petition creditors, including general unsecured creditors which, in this case, are primarily CVA Claimants.

116.    By this motion, the Debtor is not seeking at this time to pay CVA Claimants or claims arising under the CVA, as such claims will be addressed through a proposed reorganization plan.  However, to the extent that the Debtor continues to incur expenses, including the costs of defense up to the amount of any SIR, the Debtor requests that it be permitted, but not required, to continue to pay those expenses as they are incurred or subject to application and allowance by the Court pursuant to 11 U.S.C. §§330 and 331 with respect to professionals required to be retained after application to and order by this Court pursuant to 11 U.S.C. §327(b) and (e).

### b.  Authorizing Payment of Pre-Petition Obligations in Respect Thereof

117.    As of the Filing Date, outstanding obligations of the Insurance Plan total $79,387.92.  Payment of the outstanding amount due is necessary to ensure that the coverages afforded under the Insurance Plan for the Debtor and the Non-Debtor Insurance Plan Participants continue post-petition and avoid a lapse in coverage or benefits.

118.    The relief requested in this motion is necessary to ensure that the Debtor and Non-Debtor Entities maintain insurance coverage for potential claims or losses that would otherwise potentially be obligations of the Debtor or Non-Debtor Entities directly.  Further, as noted above, I understand that the Operating Guidelines and Reporting Requirements for Debtors in Possession and Trustees (the "U.S. Trustee Guidelines") requires that Chapter 11 debtors maintain insurance on a post-petition basis.

119.    Pursuant to this motion, the Debtor respectfully requests entry of an order authorizing, but not requiring, the Debtor to maintain its pre-petition Insurance Plan for its benefit and for the benefit of the Non-Debtor Insurance Plan Participants.  For the reasons set forth herein and in the motion, the Debtor believes that maintaining the Insurance Plan is in the best interests of the estate and its creditors and is required by the U.S. Trustee Guidelines.

**E. Motion for Interim and Final Orders (a) Prohibiting Utility Companies from Altering, Refusing or Discontinuing Services on Account of Pre-Petition Amounts Due, (b) Determining Adequate Assurance Payment for Post-Petition Utility Services Pursuant to 11 U.S.C. §366 and (c) Establishing Procedures for Determining Adequate Assurance of Payment**

120.     Pursuant to this motion (the "Utilities Motion"), the Debtor respectfully requests that the Court enter interim and final orders (a) prohibiting Utility Companies from altering, refusing or discontinuing services on account of pre-petition amounts due, (b) determining adequate assurance payment for post-petition utility services pursuant to 11 U.S.C. §366; and (c) establishing procedures for determining adequate assurance of payment.

121.     In the ordinary course of its operations the Debtor receives utility services including natural gas, electricity, telephone, cable, internet, waste removal and disposal and similar services (collectively, the "Utilities").  Ensuring the uninterrupted delivery of the Utilities is critical to the Debtor's need and intent to ensure that it is able to continue to operate in the ordinary course and continue to provide its programs and services to those it serves.  Any interruption in the Utilities would cause irreparable harm to the Debtor, its estate, employees, creditors, vendors and recipients of its services.

122.     The Debtor receives utility services from a number of utility providers including:

a.  Bullseye Telecom;

b.  National Grid;

c.  Verizon Wireless;

d.  Time Warner/Charter Communications;

e.  8x8 Inc.;

f.  Answerphone Inc.;

41

g.  Verizon;

h.  Firstlight Fiber;

i.  Albany Water Board;

j.  Nexamp Inc. (each a "Utility Company").

The Debtor generally pays its utility bills as they come due and is current to those utility providers.

123.  11 U.S.C. §366(b) provides that a utility

may alter, refuse, or discontinue service if neither the trustee nor the debtor, within 20 days after the date of the order for relief, furnishes adequate assurance of payment, in the form of a deposit or other security, for service after such date.  On request of a party in interest and after notice and a hearing, the court may order reasonable modification of the amount of the deposit or other security necessary to provide adequate assurance of payment.

124.  11 U.S.C. §366(c)(1)(A) provides that

For the purposes of this subsection, the term "adequate assurance of payment" means-

(i)  a cash deposit;
(ii)  a letter of credit;
(iii)  a certificate of deposit;
(iv)  a surety bond;
(v)  a prepayment of utility consumption; or
(vi)  another form of security that is mutually agreed upon between the utility and the debtor or trustee.

125.  In order to satisfy its obligations §366, the Debtor proposes to provide each Utility Company with a cash deposit (the "Deposit") in an amount equal to two weeks of the estimated cost of the respective utility usage from each Utility Company, rounded to the nearest dollar.  The Deposit will be calculated based on the average monthly cost incurred over the immediately preceding one-year period.  In the event of multiple accounts for a particular utility, the Debtor may provide a Deposit for each account or a Deposit in an aggregate amount equal to two weeks of average cost of all accounts with the particular Utility Company.  The Debtor further proposes

42

that the Deposit will be paid to the respective Utility Company within ten (10) business days of receipt by the Debtor of a written request from the Utility Company for adequate assurance of payment as provided pursuant to §366.

126.     Any Utility Company that disputes the amount of the proposed Deposit or that such amount does not constitute "adequate assurance of payment" shall, not later than twenty (20) days after entry of the interim order for the Utilities Motion, file and serve on the Debtor and bankruptcy counsel for the Debtor a request for adequate assurance (each an "Assurance Request") stating the specific amount sought.  Each Assurance Request shall include:

    a.  The account number for the particular account for which the adequate assurance payment is sought;

    b.  The address at which the utility service is provided;

    c.  The amount of any outstanding balance claimed to be owed;

    d.  A summary of the Debtor's payment history on the account;

    e.  The reason the Utility Company does not believe that the proposed Deposit is sufficient to constitute adequate assurance of payment; and

    f.  The Utility Company's proposed adequate assurance payment.

127.     The Debtor shall be authorized without further order of the Court to agree to enter into an agreement with any respective Utility Company for an amount to be paid as an adequate assurance of payment, in its discretion and in the exercise of its ordinary business judgment.  In the event that a Utility Company shall fail to assert an Assurance Request as provided for herein, such Utility Company shall be deemed to have received adequate assurance of payment in the amount of the Deposit provided for such Utility Company and shall further be deemed to have waived its right to file an Assurance Request.

128.    If a Utility Company timely files an Assurance Request and the parties cannot consensually agree on the amount for adequate assurance of payment, the Debtor shall file a notice of hearing on shortened notice, with such notice of hearing being served by overnight mail, and the Court shall determine the appropriate amount for such adequate assurance.   During the pendency of the Assurance Request, the respective Utility Company asserting such request shall be prohibited from altering, refusing or discontinuing service to, or discriminating against, the Debtor until the conclusion the hearing and the entry of an order on the Assurance Request.

129.    It is respectfully submitted that the within proposed procedure satisfies the requirements of 11 U.S.C. §366.

## CONCLUSION

130.    As set forth more fully herein, the Debtor respectfully requests that the court enter orders granting the First Day Motions, and granting such other and further relief as the court deems just and proper.

131.    Pursuant to 28 U.S.C. §1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information and belief.


Dated: March 15, 2023                          /s/Loida Sarabia
     Albany, New York                          Loida A. Sarabia
                                     Chief Financial Officer of The Roman
                                     Catholic Debtor of Albany, New York